# EXHIBIT 1

1/29/2026 12:11 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 110603500
By: Adiliani Solis
Filed: 1/29/2026 12:11 PM

Certified Document Number: 124840112 - Page 1 of 49

**Cause No._____**

| | | |
|---|---|---|
| **CHARLENE OFOSU, M.D.,** | § | **IN THE DISTRICT COURT** |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| | § | |
| **v.** | § | |
| | § | |
| | § | |
| **CHI ST. LUKE'S HEALTH** | § | |
| **BAYLOR COLLEGE OF** | § | |
| **MEDICINE MEDICAL** | § | **_____ JUDICIAL DISTRICT** |
| **CENTER, BAYLOR** | § | |
| **COLLEGE OF MEDICINE,** | § | |
| **KAIMING WU, M.D., GARY** | § | |
| **LLOYD HORN, M.D.,** | § | |
| **ZACHARY NUFFER, M.D.,** | § | |
| **NEAL SAVJANI, M.D., AND** | § | |
| **SINA FAHRTASH, M.D.,** | § | |
| | § | |
| *Defendants.* | § | **HARRIS COUNTY, TEXAS** |

**PLAINTIFF'S VERIFIED ORIGINAL PETITION AND
APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND OTHER INJUNCTIVE RELIEF**

Plaintiff Charlene Ofosu, M.D. is a board-certified Interventional

Radiologist who completed her fellowship at one of the most reputable programs

in the world. But she didn't stand a chance with Defendants because she was a

Black female physician in a service line run by a known misogynist and racist

whose bigotry the hospital and his employer had disregarded. If they will not stop

the discriminatory practices of this petty tyrant, this Court should do so now.

1

## I.   Introduction

1.     Dr. Ofosu and Defendant CHI St. Luke's Health Baylor College of Medicine Medical Center (the "Hospital") completed the third of a three-part mediation of this dispute on Wednesday, January 28, 2026. The mediation was unsuccessful.

2.     Prior to part two of the mediation, the Hospital's counsel stated in an email to Dr. Ofosu's counsel that "[i]f this matter does not settle on Wednesday, we will need to move forward with reporting the Hospital's decision to restrict Dr. Ofosu's medical staff membership and hospital privileges to the National Practitioner Data Bank ("NPDB")." In other words, the Hospital threatened to report Dr. Ofosu to the NPDB immediately—before she had exercised her due process rights established in the Hospital's medical staff bylaws, including her rights to a fair hearing and an appeal. The Hospital's counsel has now agreed to withhold reporting until after the hearing on Dr. Ofosu's Application for Temporary Restraining Order—but even a report after the date of the hearing will take place before Dr. Ofosu's fair hearing and appeals under the medical staff bylaws.

3.     Once she is reported, Dr. Ofosu's medical career will be irreparably damaged. The report will affect her ability to obtain staff membership and clinical privileges at future hospitals, employment with other physician groups, contracts

2

with insurance companies, and reasonably priced professional liability insurance. The impact on her career will be lifelong.

4. This case involves blatant racial and gender discrimination. It started before Dr. Ofosu even began her position with Baylor College of Medicine and obtained privileges at the Hospital. Defendant Kaiming Wu, M.D., who has a reputation for not wanting to work with women, attempted to have Dr. Ofosu removed from her academic position even before she arrived at Baylor. When he failed, he tried rudeness before escalating to false accusations, diatribes, and threats to have her fired. To say that Dr. Wu is triggered by the presence of a female professional is an understatement.

5. When Dr. Ofosu sought a resolution through proper channels, Dr. Wu—the very next day—began scheduling her to work only at remote locations outside the Texas Medical Center. Later in his campaign of harassment, he, along with buddies on the medical staff, breached medical staff bylaws and peer-review protocols with the goal of driving Dr. Ofosu out of Baylor and the Hospital so that Dr. Wu could install a male physician in her place. The existence of these motives is not based on inference; the motives were explicit. One of these buddies, just days after Dr. Ofosu filed a complaint for discrimination and harassment with Baylor's human resources department, baldly told Dr. Ofosu she either could quit or face humiliation by a punitive peer review. Per this physician, they would "curb

Certified Document Number: 124840112 - Page 3 of 49

her ego."

6. When Dr. Ofosu stayed put, Dr. Wu and friends held true to their promise. A sham peer review was initiated based on four of Dr. Ofosu's cases, none of which involved patient harm. Despite overwhelming evidence that Dr. Ofosu had met the standard of care, the committee misused the peer-review process by imposing a penalty that would restrict her from practicing at the Hospital with professional autonomy. Such a severe adverse action—when final— would have to be reported to the NPDB and the Texas Medical Board ("TMB").

7. As of the date of this Complaint, however, the decision to restrict Dr. Ofosu's privileges is not final—and per the NPDB, actions to restrict clinical privileges only become reportable "once they are made final by the health care entity." Still pending are the fair hearing promised to Dr. Ofosu under the Hospital's medical staff bylaws, a formal report by the fair hearing panel, and, possibly, an appeal. Yet Defendants' counsel has nevertheless informed Dr. Ofosu's counsel that, regardless of NPDB guidelines and the finality of the Hospital's decision, the Hospital intends to immediately report the peer review committee's determination. This constitutes yet another unlawful threat against Dr. Ofosu by the Hospital and its leadership.

8. Dr. Ofosu was entitled to a workplace free from harassing conduct and discrimination. Baylor's and the Hospital's own workplace policies made it

4

Certified Document Number: 124840112 - Page 4 of 49

clear these institutions were obligated to protect her from such behavior. Federal and Texas law also offer Dr. Ofosu these protections. But neither Baylor nor the Hospital took action to ensure that Dr. Ofosu was treated fairly. Instead they allowed Dr. Wu and his minions to continue their campaign to drive a Black woman out of her job.

9.      For the reasons set out below, Dr. Ofosu respectfully requests that this Court grant her Application for Temporary Restraining Order to maintain the status quo and prevent the hospital from reporting the discriminatory adverse action, issue a preliminary injunction, and grant her other relief sought in this Complaint. Temporarily preventing the Hospital (or any Defendant) from making such reports will protect Dr. Ofosu from substantial irreparable harm and will not cause any harm to the Hospital or anyone else.

10.      Because of the strength of the facts in Dr. Ofosu's favor, Dr. Ofosu also respectfully requests that, following a hearing, the Court grant a Temporary Injunction prohibiting the Hospital (or any Defendant) from reporting the Hospital's adverse action to the NPDB or TMB for the duration of the lawsuit.

11.      In the alternative, Dr. Ofosu asks the Court to, at a minimum, temporarily restrain the Hospital or any Defendant from reporting her to the NPDB or TMB until a truly fair hearing is conducted and she has exhausted all other due process rights to which she is entitled under the Hospital's medical staff bylaws.

5

## II.   Parties

12.   Plaintiff Dr. Ofosu is a resident and citizen of Washington State.

13.   Defendant CHI St. Luke's Health Baylor College of Medicine Medical Center is a Texas nonprofit corporation. Its principal office is in Harris County, Texas. It may be served by serving its registered agent, CT Corporation System, 1999 Bryan St., Ste. 900, Dallas, TX 75201.

14.   Defendant Baylor College of Medicine is a Texas non-profit corporation with its principal office in Harris County, Texas. It can be served with process by service on its registered agent, James Banfield, Risk Management, Baylor College of Medicine, 2450 Holcombe Blvd., Suite OW200, Houston, Texas 77030.

15.   Defendant Kaiming Wu, M.D., is an employee of Baylor with privileges at the Hospital. He is a resident and citizen of Harris County, Texas. He may be served with process at his place of residence, 3916 Childress St., Houston, TX  77005-1116, or wherever he may be found.

16.   Defendant Gary Lloyd Horn, M.D., is a radiologist employed by Baylor and has privileges at the Hospital. He practices medicine in Harris County, Texas, and is a resident of Galveston County, Texas. He may be served at his place of residence, 2255 Hewitt Street, League City, TX 77573-7513, or wherever he may be found.

6

Certified Document Number: 124840112 - Page 6 of 49

17.     Defendant Zachary Nuffer, M.D., is an employee of Baylor and has privileges at the Hospital. He is a resident and citizen of Harris County, Texas. He may be served at his place of residence, 546 S. 2nd Street, Bellaire, TX 77401-5002, or wherever he may be found.

18.     Defendant Neal Savjani, M.D., is an employee of Baylor and has privileges at the Hospital. He is a resident and citizen of Harris County, Texas. He may be served at his place of residence, 2012 Harvard Street, Houston, TX 77008-2537, or wherever he may be found.

19.     Defendant Sina Fahrtash, M.D., is a physician licensed in the State of Texas. Dr. Fahrtash was a resident of Harris County, Texas, and employed by Baylor with privileges at the Hospital at the time of the events set out herein. His current primary practice address as reported by him to the TMB is 1333 Northwest Freeway, Suite 540, Houston, Texas 77040. On belief, Dr. Fahrtash now resides at 3430 Lowell Street, San Diego, CA 92106-1715 in San Diego County, California. This Court has specific personal jurisdiction over Defendant Fahrtash under the Texas long-arm statute, Tex. Civ. Prac. & Rem. Code § 17.042, because Defendant purposefully directed activities toward Texas, committed tortious acts in Texas, participated in peer review actions governed by Texas law, and conducts business in Texas. Dr. Ofosu's claims arise out of and relate to those contacts, and the exercise of jurisdiction comports with traditional notions of fair play and

7

Certified Document Number: 124840112 - Page 7 of 49

substantial justice. Defendant Fahrtash may be served with process at his address in San Diego, California under Texas Rule of Civil Procedure 108 using a method prescribed under Texas Rule of Civil Procedure 106 by any disinterested person who is 18 years of age or older.

### III. Relief Sought

Plaintiff seeks monetary relief of more than $1 million, exemplary damages, treble damages, injunctive relief, attorneys' fees, costs, and pre- and post-judgment interest.

### IV. Jurisdiction and Venue

20. The Court has subject matter jurisdiction over this action because the amount in controversy is within the jurisdictional limits of this Court.

21. This Court has general personal jurisdiction over the Hospital because it is a Texas entity with its principal place of business in Texas. This Court has specific personal jurisdiction over all the Defendants because Dr. Ofosu's claims arise from Defendants' purposeful business activities conducted and torts committed in the State of Texas. This Court further has general personal jurisdiction over all the individual Defendants except for Dr. Fahrtash because they are Texas residents.

22. Venue is proper under Texas Civil Practice & Remedies Code § 15.002(a)(1) because all or a substantial part of the events or omissions giving

Certified Document Number: 124840112 - Page 8 of 49

rise to Plaintiff's claims occurred in Harris County and under § 15.002(a)(3) because the corporate defendants have their principal office in this state in Harris County. All but two of the individual defendants reside in Harris County. *See id.* at § 15.002(a)(2).

## V. Factual Background

23. Dr. Ofosu moved to the United States from her home country of Ghana at age 17. She arrived here alone, without her family, and attended college on a merit-based scholarship. She was still exploring different career paths when, just two years into Dr. Ofosu's college studies, her mother died of cancer. That loss solidified Dr. Ofosu's decision to pursue a career in medicine.

24. Today Dr. Ofosu is a radiologist certified by the American Board of Radiology and specializing in Interventional Radiology and Diagnostic Radiology. She was a top-rated graduate of one of the most respected Interventional Radiology ("IR") programs in the world: the University of California San Francisco IR program. Dr. Ofosu's childhood in a third-world country has inspired her to volunteer in her spare time to help the less privileged and homeless and to participate in programs that introduce young people from underserved populations to professional fields such as medicine.

25. In August 2024, Dr. Ofosu entered into an employment agreement with Baylor under which she agreed to serve as an Assistant Professor of

Certified Document Number: 124840112 - Page 9 of 49

Radiology. She was appointed to Baylor's academic division, which runs a teaching program for medical students, residents, and fellows. In connection with her new position, Dr. Ofosu was required to, and did, obtain a position on the medical staff of and gain privileges to practice at the Hospital, which is the affiliate teaching site for Baylor in Houston. Her employment agreement mandated that she maintain her privileges and her position on the medical staff.

26.     Dr. Ofosu had joined one of the most esteemed academic programs in the United States and was going to be practicing her specialty in the renowned Texas Medical Center. What could go wrong?

**A. The Hospital's chief of radiology services immediately launches a campaign of harassment and discrimination against Dr. Ofosu.**

27.     Dr. Wu is an Assistant Professor at Baylor and the chief of the Hospital's IR program. His issues with women are an open secret at Baylor and the Hospital. Dr. Wu didn't want another woman—and certainly not a Black woman—in the IR program. Unfortunately, Dr. Ofosu learned of Dr. Wu's contemptible and unethical inclinations too late.

28.     As Dr. Ofosu would later learn from a senior Baylor physician, Dr. Wu tried to have her removed from her new academic position before she ever began it. Dr. Wu wanted to replace her with a male doctor. His initial efforts failed, and Dr. Ofosu joined Baylor on August 5, 2024. Dr. Wu would then resort to more reprehensible conduct.

10

29. On October 24 and 27, 2024, Dr. Ofosu experienced two positive routine one-on-one evaluations with senior radiologists. The first was with the Hospital's most senior IR physician, Charles Trinh, M.D. He told her she was progressing well and expressed no concerns about patient safety. His comments were echoed three days later by Daniel Fang, M.D., the president of Radiology Partners, a radiology group that practices at the Hospital.

30. On October 25, 2024, however, Dr. Ofosu underwent her first performance evaluation before a panel. Three people were present: Dr. Horn, a radiologist; Janel Greig, the practice director at Radiology Partners; and Dr. Wu. Dr. Horn acknowledged that Dr. Ofosu had not experienced any safety complaints in connection with her patients. But Dr. Wu went off, rudely accusing Dr. Ofosu of failing to complete her call cases in a minor matter that amounted to nothing more than a difference in how Dr Wu handled call cases versus how Dr. Ofosu had been trained. No patient safety issues were involved. Dr. Wu's excessive passion was baffling.

31. Dr. Wu's aggression prompted Ms. Greig, also an accomplished female professional, to visit Dr. Ofosu later. During the visit, Ms. Greig expressed horror at Dr. Wu's behavior toward Dr. Ofosu and said he also treated her disrespectfully. Eventually Dr. Ofosu would learn from male physicians who had worked with Dr. Wu and from a male nurse in the Hospital's radiology department

Certified Document Number: 124840112 - Page 11 of 49

that Dr. Wu had a reputation for mistreating female professionals. Even Dr. Horn, who would turn out to be Dr. Wu's lackey, agreed during a December 2024 telephone call with Dr. Ofosu that Dr. Wu had been treating her inappropriately. ***Dr. Wu's open mistreatment of female professionals constitutes direct evidence of discriminatory animus.***

32.     The following month, in January 2025, Dr. Ofosu learned that she had been named to the Hospital's ride-out team for IR. Healthcare providers on the ride-out team sleep at the Hospital for extended periods of time to ensure uninterrupted delivery of care during hurricanes and other severe storms—of which there are many in Houston. Serving on the ride-out team can be stressful and emotionally draining, and it isolates providers from their family during potentially traumatic events. But Dr. Ofosu accepted the appointment with pride because she knew the IR leadership would not have chosen a physician with questionable capabilities for such a demanding role.

33.     But on January 22, 2025, Dr. Wu launched his discrimination-fueled campaign to push this Black woman out of the Hospital. On January 22, 2025, while Dr. Ofosu was performing a procedure, Dr. Wu unexpectedly barged into the procedure room. While the patient was lying on the table, Dr. Wu barked unsolicited orders at Dr. Ofosu, then left. He barged in again several other times during the procedure, barking orders and, at one point, scrubbing into the case,

12

unsolicited, while he left another patient in the other room unattended.

34.     At the end of the case, Dr. Wu barged into the room again, this time yelling at Dr. Ofosu and accusing her of clotting the patient's artery. She immediately reached to see if she could feel a pulse in the affected limb. She palpated a pulse, which is a kind of throbbing sensation that confirms blood flow in the area and hence the absence of a clot; she also palpated a "thrill," which was the desired clinical outcome. The nurse for the case, Earvin Baker, Jr., who was also a nurse manager, confirmed the presence of a pulse, which proved there was blood flow in the artery and no clot.

35.     An arterial clot is a serious and dangerous condition that needs to be addressed immediately. It's an emergency. But Dr. Wu didn't take any actions to address an emergency. No one did. No intervention ever took place because there was no arterial clot.

36.     Dr. Ofosu's patient was awake on the table this entire time. The patient and Mr. Baker also witnessed Dr. Wu's behavior. Dr. Ofosu tried to de-escalate the situation by beckoning Dr. Wu aside and asking him to discuss his concerns in a private setting. Dr. Wu became further inflamed, and Dr. Ofosu decided to remove herself from the situation at the time for fear of further escalation by Dr Wu. She later found out from Earvin Baker's recounting of the incident that Dr Wu had said in his presence, "Oh, somebody is going to be losing

13

her job!"—that somebody being Dr. Ofosu. ***Dr. Wu's actions and outburst constitute direct evidence of discriminatory an imus.***

37. Afterwards, vascular surgery also would confirm there had been no arterial clot. No intervention was performed to address an arterial clot before the patient was safely checked out of the Hospital.

38. Later that same day, Dr. Ofosu, hoping to address Dr. Wu's behavior in a professional manner, asked Dr. Horn whether Baylor had an ombudsman who might facilitate a rapprochement. Baylor does, in fact, have an ombudsman, but Dr. Horn—to protect Dr. Wu—discouraged Dr. Ofosu from contacting that person. Instead, he told her that it was customary for the radiologists to solicit the input of him (Dr Horn) and then the chair of radiology, Eric Rohren, M.D. Still trusting Dr. Horn at this point, Dr. Ofosu agreed that Dr. Horn would reach out to Dr. Rohren, who in turn scheduled a meeting with Dr. Ofosu.

39. On January 23, the day following Dr. Wu's interference in Dr. Ofosu's procedure and the day after Dr. Ofosu asked Dr. Horn about an ombudsman, Dr. Wu for the first time began scheduling Dr. Ofosu for work solely at the Hospital's peripheral sites, which were about an hour's drive from the Medical Center. When Dr. Ofosu asked Dr. Wu the reason for these changes, he told her he had "safety concerns" about her ability to handle high-risk procedures.

40. This explanation was a bad lie. If a physician truly were a threat,

Certified Document Number: 124840112 - Page 14 of 49

would she be permitted to provide incompetent services to patients in the suburbs? Dr. Wu obviously recognized Dr. Ofosu's capabilities because she had been appointed to the ride-out team and was still providing on-call coverage—both of which were likely to require her to handle high-risk, complex cases. Dr. Wu's reassignment of Dr. Ofosu was a pretext, a decision intended to punish Dr. Ofosu for having gone through proper channels to address his discriminatory conduct.

41.     On January 24, Dr. Ofosu met with Dr. Rohren. Dr. Rohren agreed that Dr. Wu's behavior had been inappropriate. He promised to counsel Dr. Wu and to request that Dr. Ofosu be reassigned to the Medical Center. Dr. Rohren then sent Dr. Wu and Dr. Ofosu to Baylor's ombudsman. *The reassignment of Dr. Ofosu the very next day after Dr. Wu's outbursts in the procedure room and Dr. Ofosu's request for an ombudsman constitute direct evidence of discriminatory animus.*

42.     Dr. Ofosu's one-on-one end-of-year faculty evaluation took place with Dr. Rohren about two weeks later. She ranked well in most categories and, once again, no safety concerns were raised. Dr. Rohren assured her in that meeting that he had asked Dr. Wu to bring her back to the Medical Center.

**B. Despite the many witnesses to his improprieties, Dr. Wu escalates his discriminatory conduct.**

43.     Dr. Wu, supported by his sidekick Dr. Horn, remained unrelenting in his harassment of Dr. Ofosu. So on February 27, 2025, Dr. Ofosu filed a formal

15

Certified Document Number: 124840112 - Page 15 of 49

complaint with Baylor's human resources department in accordance with Baylor's policies and procedures complaining of the physicians' gender discrimination, retaliation, and perpetuation of a hostile work environment.

44.     Five days after filing the complaint, on March 4, Dr. Ofosu received a call from Sina Fahrtash, M.D., another of Dr. Wu's male allies in the radiology department. Dr. Fahrtash—laughably—cautioned Dr. Ofosu "not to feel ambushed" by the fact that the "IR leadership" was reviewing her cases in order to accuse her of safety violations. Dr. Fahrtash gave her two options: leave the Hospital and Baylor, or stay and be made very uncomfortable. He told her that "they" would "curb" her "ego," ensuring that every case she performed going forward would be proctored—i.e., observed and evaluated—by another attending physician. The demeaning message that would be sent to Dr. Ofosu's peers and the Hospital's staff was she was not to be trusted to practice independently. Mandatory proctoring that lasted more than two weeks constituted an adverse action reportable to the TMB; if it lasted more than 30 days, it was reportable to the NPDB. The pressure on Dr. Ofosu to capitulate and let Dr. Wu install a male physician could not have been stronger. ***Dr. Fahrtash's comments are direct evidence of discriminatory animus.***

45.     About a week later, on March 12, Dr. Horn informed Dr. Ofosu that her six-month review, standard for new hires, was scheduled for March 24, 2025.

16

He told her that her review would take place in person, even though the other such reviews would occur remotely via Zoom. Three physicians would serve on her panel: Dr. Horn, who is not an Interventional Radiologist, Zachary Nuffer, M.D., who was a new hire, and Dr. Wu.

46.     Dr. Ofosu had learned by now that the committee would claim she had committed serious errors in her cases despite no evidence of patient harm. In violation of medical staff protocols, Dr. Horn refused to tell Dr. Ofosu which cases would be discussed so she could fully prepare for the meeting. Similarly situated other new hires were typically informed of the cases that would be reviewed. Dr. Ofosu obtained the cases only after Dr. Rhoren again intervened.

47.     On March 23, one day before Dr. Ofosu's six-month review, Dr. Trinh agreed to look at the cases that were to be discussed during Dr. Ofosu's review. He found that the violations of the standard of care alleged by the review panel were unsubstantiated.

48.     Dr. Ofosu's six-month review took place on March 24, 2025. The panel of three physicians conceded, in response to her direct question, that no safety complaints had been reported in the Hospital's Incident Response and Improvement System, a system that addresses high-risk clinical incidents. They also admitted that they did not review the other new hires' cases with the same level of scrutiny.

17

49.     In addition, the panel put forth a new reason for Dr. Ofosu's exile from the Medical Center. In contrast to Dr. Wu's previous (bogus) concerns about Dr. Ofosu's ability to handle high-acuity cases, they now said she had been relocated because of a CT drain placement case, a rather low-risk procedure. This explanation contradicted Dr. Wu's earlier explanation for relocating her. Embarrassingly, Dr. Horn said they were still "trying to figure out if [exiling her] [was] okay to do." Drs. Horn and Nuffer might as well have stated outright that they had joined Dr. Wu in his campaign of harassment. ***These actions and comments are direct evidence of discriminatory animus.***

50.     Following the six-month review, Dr. Wu completely removed Dr. Ofosu from her clinical interventional radiology duties and placed her on diagnostic radiology shifts only. Under Section 12.D.1 of the Hospital's medical staff bylaws, the suspension of a physician's clinical privileges requires the MEC to review the reasons for the suspension, conduct an interview with the physician, and assess the propriety of the restriction within 14 days of its imposition. ***This failure to comply with the medical staff bylaws is additional direct evidence of discriminatory animus.***

51.     On March 28, Dr. Ofosu learned that four of the six cases reviewed during her six-month evaluation had been reported in the Hospital's Incident Response and Improvement System and sent to the peer review committee. The

Certified Document Number: 124840112 - Page 18 of 49

two cases that were not sent to peer review implicated Dr. Wu's male pals, Dr.

Fahrtash and Dr. Savjani. Dr. Savjani would join Dr. Wu in the peer review.

52.    Dr. Trinh was the Hospital's designated/sworn-in IR peer review

committee representative, who would normally be the doctor responsible for

presenting the cases to the peer-review committee. Because he was about to leave

on a short vacation, he said he would present the cases when he returned. Dr. Trinh

also told Dr. Ofosu that he would ensure she was treated fairly.

53.    But Drs. Wu and Horn, fearing Dr. Trinh's integrity and hell-bent on

running this Black woman off, barreled forward, refusing to wait until the

designated/sworn-in IR representative returned. In a breach of peer-review

protocols, they arranged for their pal Dr. Savjani to present the cases to the peer-

review committee.

54.    The peer review committee sent Dr. Ofosu's cases to the Medical

Executive Committee ("MEC"), which informed Dr. Ofosu that it had established

an ad hoc committee to review the four cases. The committee consisted of two

physicians, neither of whom was an Interventional Radiologist or even a

radiologist. One was an older white male physician. The Hospital's attorney

commented to Dr. Ofosu that the other physician on the ad hoc committee was the

closest the Hospital could come to a female physician of color. Dr. Ofosu told both

of these doctors about her harassment complaint against Dr. Wu and Dr. Horn; the

19

Certified Document Number: 124840112 - Page 19 of 49

female physician wept after hearing this. Even so, Dr. Ofosu learned that the ad hoc committee interviewed only two people other than her about the cases: Dr. Wu and Dr. Horn, the two physicians against whom Dr. Ofosu had filed a discrimination complaint. This was another breach of the hospital's medical staff bylaws.

55.     On April 16, 2025, Baylor's Patient Safety Quality Program Manager, Marianne Galloway, informed Dr. Ofosu that her program had randomly reviewed three of her charts. In these routine reviews, Patient Safety looked at several factors, including complications and patient complaints. The program had found no problems, and Dr. Rohren, the chair of radiology, had signed off on the report. Tellingly, the only healthcare professionals who kept alleging problems in Dr. Ofosu's work were the physicians who wanted her gone.

56.     Despite the actual outcomes of Dr. Ofosu's procedures, the absence of genuine concerns about patient safety, and the overwhelming evidence that the pursuit of Dr. Ofosu was based solely on Dr. Wu's misogyny and racism, Drs. Savjani and  Horn joined Dr. Wu in recommending restricting Dr. Ofosu's IR privileges at the Hospital—exactly as Dr. Fahrtash had threatened. *These actions constitute direct evidence of discriminatory animus.*

57.     On September 15, 2025, Dr. Ofosu received a letter from the Hospital's president indicating that the MEC, relying on Dr. Wu's and Dr. Horn's

Certified Document Number: 124840112 - Page 20 of 49

input, recommended restricting Dr. Ofosu's IR privileges at the Hospital. Under the restrictions—as forecast by Dr. Fahrtash—fifty of Dr. Ofosu's procedures would have to be proctored for a period of six months. Even if she could manage to perform the 50 proctored procedures within 30 days, the Hospital confirmed the six-month proctoring period would stay in place. The six-month period ensured that the restrictions would constitute an "adverse action" requiring reporting to the TMB and the NPDB.

58.     In disbelief, Dr. Ofosu retained three independent experts to review the deidentified four clinical cases. Two were board-certified Interventional Radiologists who had trained her at the University of California at San Francisco. The third was a board-certified Interventional Radiologist at Memorial Sloan Kettering Cancer Center whom she had met just once during a virtual conference. All three physicians prepared reports confirming that Dr. Ofosu had met the standard of care in all the cases.

59.     One of the four cases was Dr. Wu's allegation of an arterial clot. All three experts, as well as the nurse manager and Dr. Trinh, had observed that this allegation was false. If Dr. Wu and his pals on the peer review committee had ever had the slightest belief in the clot story, they refused to have their misunderstanding corrected by evidence, including the imaging—or the fact that the patient left the Hospital with no intervention for what, if true, would have been

21

Certified Document Number: 124840112 - Page 21 of 49

a life-threatening condition.

60. Drs. Horn and Savjani also lined up behind Dr. Wu by dishonestly claiming that Dr. Ofosu had punctured a colon with wire in the lumen during a procedure. All three experts retained by Dr. Ofosu, as well as Dr. Trinh, stated that the imaging indicated that the wire was never in the lumen of the patient's colon— nor does documentation exist indicating that the patient suffered symptoms of having a punctured colon. A punctured colon is not a clinical mystery. The symptoms are significant and severe. This patient experienced no such symptoms. The fluid cultures collected from this drain placement also showed no bacteria growth, which would have been the case had the colon been punctured. This, like the alleged issues in the other three cases, was a pretext designed to harass Dr. Ofosu out of the Hospital. ***Such blatantly false accusations against Dr. Ofosu are direct evidence of discriminatory animus.***

61. Indeed, two of the experts who reviewed the cases at Dr. Ofosu's behest volunteered that "something else" must have been going on. That something else was Dr. Wu's and his male friends' harassment of a Black female colleague.

62. The unprecedented harsh penalty against Dr. Ofosu was particularly galling given that no patient harm had been indicated in any of the cases. Meanwhile men in Dr. Ofosu's position, i.e., male Interventional Radiologists practicing at the Hospital, had never been sent to peer review at all by the IR

Certified Document Number: 124840112 - Page 22 of 49

Certified Document Number: 124840112 - Page 23 of 49

department—even after complications that included death. The peer review committee and MEC's actions were unfounded in fact and could not have been more transparently arbitrary and capricious. ***Such inconsistent treatment of Dr. Ofosu compared with her male peers is direct evidence of discriminatory animus.***

63.     Later Dr. Ofosu would learn that the number of cases in which she was accused of deviating from the standard of care had now dropped from four to two. At this point the six cases that Dr. Wu originally found problems with had first been decreased to four (via subtraction of the two cases implicating Drs. Fahrtash and Savjani) and then to two—even after a formal "investigation" that culminated in a letter signed by the Hospital's president alleging violations of the standard of care in *four* cases.

64.     Defendants have not put forth any explanation for striking yet another two cases. But the most recent reduction further indicates that this was never a sincere peer-review action. And, regardless, the two remaining cases, like all the cases, on their face involved no patient harm or violations of the standard of care.

**C. The Hospital's decision to impose six months of proctored procedures on Dr. Ofosu makes this adverse action immediately reportable to the NPDB and TMB—but only after the adverse action becomes final.**

65.     As acknowledged by the Hospital in its September 15 letter, Texas law and the Hospital's medical staff bylaws entitle Dr. Ofosu to a mediation of the matter with the Hospital and a fair hearing. Dr. Ofosu requested both.

23

66.     The mediation took place in three parts, the last of which occurred on January 28, 2026. It was unsuccessful.

67.     Per Section 13 of the Hospital's medical staff bylaws, Dr. Ofosu will be entitled to a fair hearing. The hearing will be conducted before a panel of three persons, none of whom participated in the initial decision and two of whom must be a physician. While Dr. Ofosu has requested this fair hearing in accordance with the bylaws, the hearing date has not yet been set. Also per the Hospital's medical staff bylaws, within 20 days of the fair hearing, the hearing panel will prepare a written report and recommendation to be delivered to the Hospital's president; during the 20-day period, the hearing panel may reconvene the hearing and request or receive additional evidence. The medical staff bylaws specifically entitle Dr. Ofosu to receive a copy of this report and the governing board's final decision.

68.     Section 13.E of the Hospital's medical staff bylaws sets out circumstances when an appeal of the hearing panel's decision may be sought. And Section 12.E.4(4) of the Hospital's medical staff bylaws states that a recommendation by the MEC "will not be considered for *final* action by the Board until *after* the Practitioner has completed or waived a hearing and appeal" (emphasis added). The hearing has not yet taken place, and Dr. Ofosu has not waived a hearing. Therefore, no report has been issued by the fair hearing panel, and no party has yet exercised or waived an appeal. The hospital's decision is not

24

final.

69.     Because the decision is not yet final, under NPDB guidelines, there is no final decision to report to the NPDB; any "report" regarding the peer-review committee's recommendation would be premature and quite likely contrary to the findings of the fair-hearing panel.

70.     Even so, the Hospital's counsel has made it clear that the Hospital intends to report the peer-review committee's recommendation—prior to the fair hearing, the panel's report, a decision by the Hospital's governing board, and any appeal—immediately following the hearing on Dr. Ofosu's Application for Temporary Restraining Order. Doing so will not comport with the NPDB Guidebook, which provides that adverse actions affecting clinical privileges are not reportable until "they are made final by the health care entity."[1] Under the NPDB's definition, an investigation is not complete "until a final decision on a clinical privileges action is reached."[2] Reporting also would violate Section 12.E.4(4) of the Hospital's medical staff bylaws.

71.     Reporting under these circumstances also would simply be wrong. Assuming the fair hearing is indeed "fair," it could very well change the Hospital's determination. A premature report to the NPDB before that time could ultimately

---

[1] Nat'l Practitioner Data Bank, NPDB Guidebook, *Reporting Clinical Privileges Actions*, at https://www.npdb.hrsa.gov/guidebook/EClinicalPrivileges.jsp.
[2] *Id.*

25

be contradicted by the results of the fair hearing, yet it would nevertheless cause Dr. Ofosu irreparable harm.

72. An NPDB report will: (1) automatically trigger a TMB investigation that Dr. Ofosu will be forced to incur great cost to defend; (2) permanently injure Dr. Ofosu's relationships with her patients and insurance companies; (3) make it difficult for Dr. Ofosu to become credentialed at another hospital; and (4) undermine Ofosu's ability to make a living as a physician. A TMB report will lead to similar harm to Dr. Ofosu.

73. In contrast to the harm that Dr. Ofosu faces, the Hospital will suffer no harm if it is prevented from immediately reporting Dr. Ofosu to the NPDB and TMB. Thus, the balance of the equities favors entering a temporary restraining order and a temporary injunction in Dr. Ofosu's favor. The NPDB Guidebook specifically contemplates that a peer-review action may be enjoined and that "an adverse action enjoined prior to implementation should not be reported."[3]

## VI. Malice

74. Defendants acted with actual malice or reckless disregard for the truth of the allegations against Dr. Ofosu. Defendants' repeated adverse actions without a factual basis were driven by their animus against Black females and specifically

---

[3] *Id. at Q&A: Reporting Clinical Privileges Actions,* No. 33, https://www.npdb.hrsa.gov/guidebook/EClinicalPrivilegesQA33.jsp.

Certified Document Number: 124840112 - Page 26 of 49

intended to cause Dr. Ofosu substantial injury or harm by harassing her until she gave up her position and left Baylor and the Hospital.

75. These malicious intentions are shown by Dr. Wu's attempt to remove Dr. Ofosu from Baylor's academic division from the outset and his harsh treatment of her throughout the events described here. Within months of Dr. Ofosu's employment, Dr. Wu drummed up accusations about an arterial clot, caused a scene in the procedure room, and promised to have Dr. Ofosu's job after she asked that the discussion take place outside the presence of her patient and Hospital staff. His exiling of Dr. Ofosu from the Texas Medical Center further demonstrates Dr. Wu's malice. Malice is also shown by Dr. Fahrtash's ultimatum that Dr. Ofosu could either resign her position or have her "ego curbed" and face punishment at the hands of a sham peer review committee.

76. The disparate manner in which Dr. Ofosu's six-month review was handled also demonstrates malice: the panel's initial refusal to notify Dr. Ofosu of the cases that would be discussed, the scheduling of the meeting in person rather than via Zoom, as with the other new hires, and the admission by Dr. Nuffer that Dr. Ofosu had been singled out for greater scrutiny than the other male new hires.

77. The malice is further evidenced by the fact that the peer review committee operated outside its normal procedures, with Dr. Savjani slotting himself in in place of the committee's designated IR peer review committee

Certified Document Number: 124840112 - Page 27 of 49

representative—not to mention the bogus findings by Drs. Wu, Horn, Savjani, and Nuffer. Those false findings are contradicted by professionals within and outside the Hospital. The fact that the Hospital found violations of the standard of care in all four cases, following what should have been a full investigation—and issued a formal letter reporting the violations—only to later retract two of the cases further underscores the fact that these actions were performed with malice and that the peer review was not undertaken with the seriousness it required.

78. The committee members' imposition of excessive proctoring over an extended period of time, despite no evidence of patient harm (or of a punctured colon or an arterial clot), further demonstrates Defendants' malice and irrational ill will toward Dr. Ofosu and their desire to retaliate against her for objecting to their discrimination. Defendants had never inflicted such conduct on their male peers. Their own colleagues, including Dr. Trinh and Dr. Rohren, Hospital staff members, and Ms. Greig, recognized that their behavior was inappropriate and biased.

79. The Hospital's threat to report Dr. Ofosu to the NPDB before her fair hearing and the panel's report—i.e., before the Hospital's decision becomes final—underscores the malice directed toward Dr. Ofosu.

## VII. Defendants Are Not Entitled to Immunity Under HCQIA.

80. Immunity under the Health Care Quality Improvement Act (HCQIA)

28

only applies if a professional action is taken:

    a. in the reasonable belief that the action furthers quality health care;

    b. after a reasonable effort to obtain the facts of the matter;

    c. after affording adequate notice and hearing procedures to the physician; and

    d. with the reasonable belief that the action was warranted by the known facts.

81.    Thus Dr. Ofosu must only establish that the professional review action was taken without satisfying any one of the foregoing criteria for Defendants to lose immunity. The evidence here shows that the actions taken against Dr. Ofosu were not in furtherance of quality health care but were part of a discriminatory campaign attempting to drive a Black female physician away.

82.    The Hospital, Baylor, the peer-review committee, and the MEC did not make reasonable efforts to obtain the facts of the matter and did not act under a reasonable belief that the action was warranted. Rather, Dr. Wu and his minions acted out of discriminatory motives.

**VIII.  Defendants Are Not Entitled to Immunity Under HCQIA 11137(c).**

83.    Section 1137(c) of HCQIA offers a more limited immunity related to claims arising specifically out of reports made to the NPDB in good faith. To the extent that this limited immunity would apply to Dr. Ofosu's claims, Defendants are not entitled to Section 1137(c) immunity because Defendants knew the

29

Certified Document Number: 124840112 - Page 29 of 49

contents of it were false when they submitted the report. Accordingly, Defendants are not entitled to immunity under HCQIA for submission of the NPDB report.

## IX. Defendants Are Not Entitled to Immunity Under the THCQIA.

84. Defendants also are not entitled to immunity under the Texas Health Care Quality Improvement Act ("THCQIA"), Tex. Occ. Code § 160.0101, *et seq.* This is because Defendants acted with actual malice, with a deliberate intention to cause injury or harm to Dr. Ofosu based on her race and gender. In addition to those federal claims for which no immunity exists, many of Defendants' tortious and wrongful acts occurred outside of the peer review process, and Defendants would not be entitled to any immunity to those claims. Accordingly, Defendants are not entitled to immunity under the THCQIA.

## X. Causes of Action

### Count 1: Defamation

85. Dr. Ofosu repeats the allegations set forth above as if fully set forth herein.

86. Defendants published defamatory and false statements to doctors and staff at the Hospital regarding Dr. Ofosu's alleged professional incompetence. Many of these allegations took place outside the peer review process.

87. First, Dr. Wu barged into the procedure room, shouting in the presence of the patient and a nurse that Dr. Ofosu was failing to address an existing

30

Certified Document Number: 124840112 - Page 30 of 49

arterial clot. This was a lie intended to undermine Dr. Ofosu's reputation among her peers and colleagues. The falsity was demonstrated by the presence of a pulse; Dr. Ofosu and nurse manager Earvin Baker both observed the normal blood flow. The falsity is further demonstrated by the fact that Dr. Wu did not initiate any emergency actions to address an arterial clot.

88.     Drs. Horn, Nuffer, and Wu then published additional falsehoods about Dr. Ofosu's competence. They further published to the peer-review committee, as well as to Dr. Trinh and Dr. Rohren, the falsehood about the nonexistent clot, a falsehood about a pierced colon that had demonstrably not been pierced, and two other cases in which they alleged serious errors by Dr. Ofosu. The sham peer-review committee and MEC then took improper actions that, if not enjoined, will result in the publication of the peer-review committee's bogus findings to the NPDB and the TMB. The falsity of the statements is demonstrated by the fact that other professionals at the Hospital and from other acclaimed institutions found no evidence of the alleged mistakes and determined that Dr. Ofosu's performance had been within the standard of care.

89.     The context of the false statements highlights their falsity and the malice with which they were published: the statements were made during a campaign of harassment initiated by Dr. Wu, whose aversion to female professionals was well known, who had publicly stated his resistance to working

31

with Dr. Ofosu even before she started, who had—within months of her joining Baylor and the Hospital's medical staff—screamed at her while she was in the middle of a procedure and threatened to have her fired (a threat overheard by Mr. Baker) and then the following day modified the schedule so that she was exiled to remote Hospital locations. Dr. Wu's threats were soon followed by an ultimatum issued by Dr. Fahrtash that Dr. Ofosu could either resign now or be subjected to punishment via a sham peer review that would—as ultimately happened—strip her of her professional autonomy, condemn her to proctored procedures, and result in a mandatory report of an adverse action to the TMB and NPDB.

90.    Defendants' false statements were made knowingly, recklessly, and maliciously and without right, privilege, or justification. They were made to drive a female professional away from her job solely because she was a Black female, a gender that Dr. Wu was known to treat with disdain.

91.    Such statements harmed Dr. Ofosu in her profession and constitute defamation per se. Defendants are not entitled to immunity for such statements because they were made outside the peer review process and because Defendants do not meet the elements to be entitled to immunity.

92.    Defendants' defamation has caused Dr. Ofosu great anguish, humiliation, emotional distress, inconvenience, and loss of enjoyment of life that entitle her to compensatory damages.

32

Certified Document Number: 124840112 - Page 32 of 49

## Count 2: Tortious Interference with Existing Contracts

93.     Dr. Ofosu repeats the allegations set forth above as if fully set forth herein.

94.     Dr. Ofosu had a valid contract with Baylor and a position on the Hospital's medical staff. Defendants willfully and intentionally interfered with Dr. Ofosu's contracts by initiating a campaign of harassment to make her quit her job. Dr. Wu deliberately interfered with her work, berated her in front of staff members, scheduled her only to remote locations, and made false accusations about the quality of her work. Other physicians joined in making those false accusations, despite the fact that no patient harm had been shown and multiple experts in Interventional Radiology, including one of their most seasoned colleagues, had attested to Dr. Ofosu's compliance with the standard of care.

95.     Dr. Wu's and the other male physicians' intention to interfere in Dr. Ofosu's contract with Baylor and her position on the Hospital's medical staff was made explicit when Dr. Fahrtash gave Dr. Ofosu an ultimatum: quit, or have her career destroyed. When Dr. Ofosu stood on her legal rights, Dr. Fahrtash joined Drs. Wu, Nuffer, Horn, and Savjani to make false findings of incompetence and mistakes made by Dr. Ofosu and to impose an irrational and excessive penalty on her of 50 proctored procedures during a minimum six-month period.

96.     The discrimination created a working environment so intolerable that

33

Certified Document Number: 124840112 - Page 33 of 49

Dr. Ofosu's continued service under her contracts was impossible. As a direct result of Defendants' conduct, Dr. Ofosu was forced to resign from Baylor and the Hospital's medical staff. Her resignation was not voluntary but compelled by Defendants' unlawful actions and the hostile work environment. It amounted to a constructive termination.

97. This termination resulted in Dr. Ofosu's loss of her agreement with Baylor and loss of her medical staff privileges at the Hospital. She was forced to leave Houston altogether to find a less discriminatory environment in which to practice medicine.

98. Defendants' interference has proximately caused Dr. Ofosu loss of the income that the contracts would have generated and the expenses associated with relocating to another city and starting over.

99. Dr. Ofosu is also entitled to an award of exemplary damages because Defendants' tortious interference was conducted with malice.

**Count 3: Malicious/Sham Peer Review**

100. Dr. Ofosu repeats the allegations set forth above as if fully set forth herein.

101. While peer review is intended to ensure quality care and patient safety, Texas law recognizes that the process can be misused. Defendants initiated the peer-review process against Dr. Ofosu with malice. The entire peer-review

Certified Document Number: 124840112 - Page 34 of 49

process was foreshadowed by Dr. Wu's vow that "somebody is going to be losing her job!" and Dr. Fahrtash's ultimatum that Dr. Ofosu quit or face a punitive peer-review process. When Dr. Ofosu did not quit, Drs. Wu, Horn, Nuffer, and Savjani, unchecked by the Hospital or Baylor, engaged in a sham peer-review process based on four cases involving no patient harm in which a senior member of the IR team, as well outside IR experts, had found that Dr. Ofosu's performance met the standard of care.

102.   The accusations of incompetence and mistakes by Dr. Ofosu were part of a campaign initiated by Dr. Wu, whose racism and misogyny escalated to threats that he would have her fired. To accomplish this goal, he, along with his peers, misused the peer-review process—just as Dr. Fahrtash had threatened.

103.   These physicians, fueled by bias, falsely detected mistakes where no mistakes existed and willfully dismissed overwhelming contrary evidence provided by Dr. Ofosu and others.

104.   Objectively, Defendants' conduct involved an extreme risk of harm to Dr. Ofosu. Subjectively, Defendants had actual awareness of the extreme risk and proceeded with conscious indifference to Dr. Ofosu's rights. They knew that the allegations against Dr. Ofosu lacked merit, yet they proceeded with the peer review to punish her, destroy her professional autonomy, create an intolerable working environment, and force her to resign.

Certified Document Number: 124840112 - Page 35 of 49

105.   As a direct result of Defendants' conduct, Dr. Ofosu suffered substantial damage to her reputation, medical career, and medical practice as well as mental anguish, humiliation, emotional distress, and loss of enjoyment of life, thereby entitling her to compensatory damages.

**Count 4:  Retaliation under Chapter 21 of the Texas Labor Code and Section 161.134 of the Texas Health and Safety Code**

106.   Dr. Ofosu repeats the allegations set forth above as if fully set forth herein.

107.   Dr. Ofosu was a Baylor employee under contract with Baylor. At all relevant times, she was a licensed physician in good standing on the Hospital's medical staff with full privileges. Her membership on the medical staff was governed by the Hospital's medical staff bylaws. As of the date of this Complaint and the events recounted herein, Dr. Ofosu had practiced independently and competently with no substantiated patient safety concerns, patient complaints, or adverse outcomes.

108.   Dr. Ofosu engaged in protected activity by opposing and reporting Dr. Wu's unlawful employment practices, including discriminatory behavior based on her race and gender, through appropriate channels. Dr. Ofosu reasonably believed in good faith that Dr. Wu's conduct violated federal and state laws barring discrimination. As directed by Dr. Horn, Dr. Ofosu first sought the assistance of Dr. Rohren, the chair of radiology, and then through the ombudsman as directed by

36

Certified Document Number: 124840112 - Page 36 of 49

Dr. Rohren.

109.  Following Dr. Ofosu's protected activity, Dr. Wu, along with members of the medical staff—including Drs. Horn, Nuffer, Fahrtash, and Savjani—participated in a series of escalating retaliatory acts fueled by discriminatory motives against Dr. Ofosu.

110.  First, the day after Dr. Ofosu reached out to Dr. Rohren, Dr. Wu exiled her to the suburban branches of the Hospital under the pretext that she had engaged in unsafe practices—a demonstrably false assertion because a) no safety complaints had been lodged against Dr. Ofosu, b) an unsafe physician is equally unsafe in the suburbs, and c) Dr. Ofosu had been placed on the ride-out team for IR and was on-call, both of which presented the likelihood that she would be required to handle high-risk, complex cases.

111.  Defendants escalated their retaliatory behavior following Dr. Ofosu's February 27, 2025 complaint to Baylor's human resources department about Dr. Wu's and Dr. Horn's gender and racial discrimination and harassment. This complaint also constituted protected activity. Five days later, on March 4, in retaliation, Dr. Fahrtash called Dr. Ofosu, threatening her that, if she did not resign, she would be peer reviewed and forced to "curb" her "ego." He threatened imposition of substantial proctored procedures so that she would never again practice with autonomy. The ensuing reports to the TMB and NPDB would ensure

37

enduring damage to her professional reputation.

112.    The retaliation continued during Dr. Ofosu's six-month review a few weeks later on March 24. First, Dr. Ofosu, unlike the other new hires, who were all males, was subjected to an in-person six-month review, while the other reviews were performed via Zoom. The review panel, composed of Drs. Horn,  Nuffer, and Wu, further breached protocols by refusing to inform Dr. Ofosu of the cases they intended to review as part of the process. Dr. Nuffer also admitted that Dr. Ofosu was receiving greater scrutiny than similarly situated non-female new hires. These three physicians further participated in the retaliatory behavior by manufacturing otherwise nonexistent irregularities in four of her cases, sending her to peer review just a few days later.

113.    The peer review committee and MEC further engaged in retaliatory behavior. First, they departed from medical staff protocol and customary practice by initiating the peer review while the Hospital's designated peer review committee representative for Interventional Radiology was on a brief vacation. They claimed to have found irregularities in four cases that did not exist, as attested to by other colleagues and numerous experts in the field. The imposition of 50 proctored procedures over six months was unprecedented and excessive, particularly given that none of the four cases involved any allegation of patient harm. There were no objective clinical findings to support the punishment and no

38

Certified Document Number: 124840112 - Page 38 of 49

substantiated and documented prior performance deficiencies. The fact that the number of cases allegedly involving serious errors dropped from four to two *following formal issuance of a determination* further shows that the Hospital and peer-review committee had not seriously scrutinized the cases but were, instead, out to punish Dr. Ofosu.

114. The peer review committee's recommendation had nothing to do with evaluating Dr. Ofosu's performance; it was punishment intended to humiliate her, teach her a lesson, and eliminate her. The committee's imposition of a firm six-month time frame on the proctoring requirement ensured Dr. Ofosu would be reported to the TMB and the NPDB—all as punishment for a basic request that she be permitted to practice her specialty without being subjected to harassment and a hostile work environment.

115. The retaliation is underscored by the Hospital's selective enforcement of standards on Dr. Ofosu, a Black woman, versus its treatment of non-Black male physicians. Similarly situated non-Black male physicians who did not engage in the protected activity were not subjected to comparable proctoring. In fact, no male physician in the IR department had ever been reported by the IR department to be peer reviewed—even after a patient had died. Suffice it to say no male physician in the IR department has ever been subjected to such an absurd proctoring requirement. In short, the treatment of the Hospital's male Interventional

Certified Document Number: 124840112 - Page 39 of 49

Radiologists was far more circumspect and forgiving than the poor treatment Dr. Ofosu received at the hands of Dr. Wu and his buddies.

116. The close temporal proximity between Plaintiff's protected activity and the retaliatory conduct—e.g., the exile to peripheral facilities the day after Dr. Ofosu contacted Dr. Rohren and Dr. Fahrtash's ultimatum issued just four days after Dr. Ofosu's complaint to Baylor HR—all followed in close sequence, escalating in intensity the longer Dr. Ofosu refused to resign. This series of increasingly punitive acts, culminating in imposition of excessive proctoring requirements and an adverse action, combined with Defendants' deviation from established procedures and the absence of legitimate quality concerns, demonstrates a causal connection between Plaintiff's protected activity and the adverse action.

117. Defendants' retaliation and the imposition of the proctoring requirement have materially interfered in Dr. Ofosu's practice of medicine. It has restricted her professional autonomy, damaged her professional reputation, impaired her ability to build relationships with Hospital staff and referring physicians, and imposed substantial economic and professional harm on her, including economic damages. Moreover, the conduct exhibited by Defendants would deter a reasonable physician like Dr. Ofosu from reporting discrimination or misuse of the peer review process and violates protections against retaliation.

40

Certified Document Number: 124840112 - Page 40 of 49

118.    Defendants' retaliatory acts subjected Dr. Ofosu to material adverse employment actions, including increased scrutiny of her work, increased hostility, and a punitive peer-review proceeding. Such materially adverse acts rendered Dr. Ofosu's working conditions intolerable and resulted in a constructive termination of her employment.

119.    Because of Defendants' retaliation against her, Dr. Ofosu is entitled to damages for lost wages and other compensation, reputational harm, damage to her career trajectory, and anxiety, mental anguish, humiliation, and emotional distress.

120.    In their discriminatory actions as alleged above, Defendants have acted with malice or reckless indifference to Dr. Ofosu's rights, thereby entitling her to an award of exemplary damages.

**Count 5:  Claim for Declaratory Relief**

121.    Dr. Ofosu repeats the allegations set forth above as if fully set forth herein.

122.    Pursuant to Chapter 37 of the Texas Civil Practice & Remedies Code, Dr. Ofosu requests that the Court:

      a.   Declare that the peer review process and subsequent findings were malicious, discriminatory, and unjustified such that the adverse actions taken against Dr. Ofosu, including imposition of the proctoring requirements for six months, are null and void;

      b.   Declare that a report to the NPDB and TMB is not required based on the unsupported and unlawful actions of Baylor, the Hospital;

41

Certified Document Number: 124840112 - Page 41 of 49

c. Declare that the Hospital should not have sent, or should not send, a report to the NPDB because the cases presented to the peer-review committee and the actions of the peer-review committee do not meet NPDB reporting requirements;

d. Issue a permanent injunction to prohibit the Hospital and Baylor from enforcing, following, relying on, or otherwise utilizing the adverse actions Defendants have taken against Dr. Ofosu; and

e. Issue a permanent injunction to prohibit the Hospital from reporting Dr. Ofosu to the NPDB because the cases subject to the peer-review committee and the determinations of the peer-review committee do not constitute reportable events.

## XI. Application for Temporary Restraining Order, Temporary Injunction, and Permanent Injunction

123. The purpose of injunctive relief "is to halt wrongful acts that are either threatened or in the course of accomplishment."[4] Dr. Ofosu asks this Court to temporarily and permanently halt reports to the NPDB and TMB because the peer-review process and other actions of Defendants that led to her restrictions were fueled by discrimination and retaliatory conduct by biased physicians. The peer-review committee's decision was unreasonable, unprecedented, based on whim and prejudice, and lacked a rational connection to the evidence. It was therefore arbitrary and capricious and not founded on facts.

124. In the alternative, Dr. Ofosu requests that the Court halt the Hospital from making any report about her to the NPDB and TMB until the adverse action

---

[4] *Wiese v. Heathlake Cmty. Ass'n, Inc.*, 384 S.W.3d 395, 399 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

42

Certified Document Number: 124840112 - Page 42 of 49

is made final by the Hospital—i.e., until after a fair hearing, any appeals, and a determination by the Hospital's governing board, as required under the Hospital's medical staff bylaws.

## A. Legal standards

125.  To obtain injunctive relief, an applicant must show: "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002); see also In re Turner, 558 S.W.3d 796, 799 (Tex. App.—Houston [14th Dist.] 2018) (stating same elements in assessing application for temporary restraining order).  Entitlement to injunctive relief also requires that the movant lack an adequate remedy at law. *Jim Rutherford Invs., Inc. v. Terramar Beach Cmty. Ass'n*, 25 S.W.3d 845, 849 (Tex. App.—Houston [14th Dist.] 2000, pet. denied).

126.  Whether to grant temporary or permanent injunctive relief is ordinarily within the sound discretion of the trial court and, on appeal, review of the trial court's action is limited to whether the trial court clearly abused its discretion. *Gannon v. Payne*, 706 S.W.2d 304, 305 (Tex. 1986); *Bay Fin. Sav. Bank, FSB v. Brown*, 142 S.W.3d 586, 589 (Tex. App.—Texarkana 2004, no pet.); *Noell v. City of Carrollton*, 431 S.W.3d 682, 712 (Tex. App.—Dallas 2014, pet.

Certified Document Number: 124840112 - Page 43 of 49

denied).

## B. Dr. Ofosu has asserted valid causes of action against Defendants and has demonstrated a probable right to relief.

127. Dr. Ofosu requests a temporary restraining order, temporary injunction, and permanent injunction enjoining Defendants from reporting her restrictions to the NPDB or TMB. Dr. Ofosu has a probable right to this relief because, as shown by her specific, verified allegations, the peer-review process that resulted in her restrictions was fueled by bias based on Dr. Ofosu's race and gender. The peer review committee did not base its determination to impose excessive proctoring requirements on Dr. Ofosu's performance. The only reason peer review took place at all was so that Dr. Wu and his male friends could finally push Dr. Ofosu out of Baylor and off the Hospital's medical staff after she refused to buckle to Dr. Wu's harassment and Dr. Fahrtash's threat of a punitive peer-review outcome that would render her working conditions intolerable. That the peer review took place in a rush outside of the medical staff's normal procedures, specifically without the participation of the peer-review representative for IR, underscores this fact.

128. As demonstrated by insights of Dr. Ofosu's peers at the hospital and the experts in IR from other prominent hospitals, the determinations by the peer-review committee lacked substance. No patients had experienced harm, and Dr. Ofosu had performed within the standard of care. The decision was arbitrary and

44

capricious and not founded on facts; it was based only on Dr. Wu's and his friends' discriminatory intention to get rid of Dr. Ofosu.

129.    That Defendants intend to report Dr. Ofosu to the NPDB and TMB before the Hospital's decision is final—i.e., before Dr. Ofosu's fair hearing, a report by the fair hearing panel, and any appeals, as required by the Hospital's medical staff bylaws—underscores the fact that Defendants are motivated not by a desire for patient safety but by animus against a Black woman who failed to "curb her ego" before certain of her male detractors.

## C. Without injunctive relief, Dr. Ofosu will suffer actual imminent irreparable injury for which she will have no adequate remedy at law.

130.    Dr. Ofosu's injuries are probable, imminent, and irreparable if she is reported to the NPDB and/or TMB. Her reputation as a provider will be permanently and irreparably damaged. *This is true even if, following a fair review hearing, the Hospital reverses the peer-review committee's determinations.*

131.    Dr. Ofosu has already lost her Hospital privileges and employment with Baylor by virtue of her constructive termination. If a report is made to the NPDB and TMB, any other hospital at which Dr. Ofosu seeks privileges in the future would have access to the adverse report submitted to it, thereby harming Dr. Ofosu's reputation indefinitely and unfairly.

132.    Any hospital, managed care organization, or physician employer considering hiring her would be required to query the NPDB. The existence of

45

such an adverse report would carry "an indelible stigma" harming Dr. Ofosu's reputation and raising questions as to her competence.[5] Additionally, Dr. Ofosu's NPDB report would be pulled and reviewed by insurance companies considering contracting with her, placing her in a negative light and likely leading to rejections.

133. "An erroneously filed report announcing to all parties that a physician has been sanctioned, suspended, or lacks the adequate skill to practice medicine carries with it the potential to immediately and irrevocably harm that physician and his practice."[6] The stigma and reputational harm in turn threaten Dr. Ofosu's ability to obtain and keep future employment.[7] The damage to Dr. Ofosu's practice would begin the moment the Hospital issued the reports and follow her until the end of her career.

134. In short, the harm caused to Dr. Ofosu by NTSB and TMB reports about the incident would be ongoing, varied, and sometimes difficult to confirm. Quantifying her damages would be impossible under the circumstances, such that an award of monetary damages would not offer an adequate remedy. Dr. Ofosu therefore has shown that she will suffer an actual and imminent irreparable injury for which she will have no adequate remedy at law.

---

[5] *See Walker v. Mem'l Health Sys.*, 231 F.Supp.3d 210, 216 (E.D. Tex. 2017).
[6] *Id.*
[7] *See id.*

Certified Document Number: 124840112 - Page 46 of 49

**D. The balance of the hardships weighs in Dr. Ofosu's favor.**

135. The injuries Dr. Ofosu faces if Defendants report her to the NPDB and TMB greatly outweigh any damage they would sustain as a result of the injunctive relief. On the one hand, an erroneous NPDB report or TMB complaint indisputably would irreparably damage Dr. Ofosu's reputation and destroy her career as a physician. On the other, temporarily preventing the Hospital from reporting Dr. Ofosu to the NPDB and TMB will harm no one. The allegations against Dr. Ofosu are clearly based on discrimination, but even if taken as true, not a single case indicates any harm to patients. The balance of the hardships therefore weighs in Dr. Ofosu's favor.

**E. Injunctive relief will not adversely affect the public interest.**

136. Injunctive relief will not disserve the public interest. The public interest does not favor peer reviews motivated by discrimination, interfering with the doctor-patient relationship, depriving patients of care, or unnecessarily harming someone's reputation or ability to earn a living. Enjoining such harm is consistent with public policy. Moreover, Dr. Ofosu is a highly specialized physician in Interventional Radiology. Nothing is to be gained from withdrawing her expertise from the field of medicine based on an erroneous report that, if issued, will likely permanently restrict her availability to patients.

47

Certified Document Number: 124840112 - Page 47 of 49

137. This application for injunctive relief is supported by Dr. Ofosu's attached verification and declaration. See Exhibit 1.

138. Dr. Ofosu is willing to post a bond for temporary injunctive relief if required. Any bond should be de minimis because the relief she seeks is intended only to enforce her established rights and poses no genuine risk of harm or prejudice to the Hospital.

## XII. Conditions Precedent

139. All conditions precedent to Plaintiff's claims have occurred or have been performed.

## XIII. Prayer

Plaintiff prays for judgment against Defendants as set forth above and as follows:

1. For injunctive relief against the Hospital as outlined above;

2. For actual damages;

3. For exemplary damages;

4. For pre- and post-judgment interest at the applicable legal rate;

5. For reasonable and necessary attorneys' fees; and

6. For such other relief as the Court deems just and proper.

Dated: January 29, 2026.

Certified Document Number: 124840112 - Page 48 of 49

Respectfully submitted,

**NICHOLS WEITZNER THOMAS LLP**

*/s/ Scott Nichols*
Scott Nichols
Texas Bar No. 14994100
snichols@nwtlaw.com
(713) 405-7094
Zachary W. Thomas
Texas Bar No. 2470739
zthomas@nwtlaw.com
(713) 405-7096
2402 Dunlavy Street
Houston, Texas 77006

Certified Document Number: 124840112 - Page 49 of 49



I, Marilyn Burgess, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   January 30, 2026

Certified Document Number:        124840112 Total Pages:  49

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**