**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **CHARLENE OFOSU, M.D.,** | § | |
| | § | |
| ***Plaintiff,*** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **CHI ST. LUKE'S HEALTH** | § | |
| **BAYLOR COLLEGE OF** | § | **C.A. NO. 4:26-CV-00761** |
| **MEDICINE MEDICAL** | § | |
| **CENTER, BAYLOR** | § | |
| **COLLEGE OF MEDICINE,** | § | |
| **KAIMING WU, M.D., GARY** | § | |
| **LLOYD HORN, M.D.,** | § | |
| **ZACHARY NUFFER, M.D.,** | § | |
| **NEAL SAVJANI, M.D., AND** | § | |
| **SINA FAHRTASH, M.D.,** | § | |
| | § | |
| ***Defendants.*** | § | |

**PLAINTIFF'S OPPOSITION TO DEFENDANT CHI ST. LUKE'S HEALTH BAYLOR COLLEGE OF MEDICINE MEDICAL CENTER'S MOTION TO DISMISS**

Plaintiff Charlene Ofosu, M.D., opposes the Motion to Dismiss filed by Defendant St. Luke's Health Baylor College of Medicine Medical Center (the "Hospital") for the reasons discussed below.

## TABLE OF CONTENTS


I. Nature and Stage of Proceeding ....... 1

II. Statement of the Issues ....... 1

III. Relevant Factual Background ....... 2

IV. Argument ....... 7

A. The Hospital's 12(b)(1) Motion to Dismiss should be denied. ....... 7

1. A court has subject matter jurisdiction over a physician's causes of action that involve an NPDB report when exhausting all administrative remedies would be futile. ....... 7

2. The relief Dr. Ofosu seeks from this Court is not within the Secretary's purview, so she should not be required to exhaust all administrative remedies under the NPDB dispute process. ....... 12

3. Because the Secretary has no authority to order damages, it would be doubly improper to dismiss Dr. Ofosu's defamation claim for lack of subject matter jurisdiction. ....... 14

B. The Hospital's 12(b)(6) Motion to Dismiss should be denied. ....... 14

1. Malicious/sham peer review is indeed a cause of action under Texas law. ....... 15

2. Dr. Ofosu has adequately alleged standing under Section 21.055 of the Texas Labor Code. ....... 17

3. Dr. Ofosu has stated a claim under Section 161.135 of the Texas Health & Safety Code. ....... 19

V. Conclusion ....... 21

VI. In the alternative, motion for leave to file an amended complaint. ....................21

VII. Prayer....................22

CERTIFICATE OF WORD COUNT....................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662, 678 (2009)....................15

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................15

*Bonzani v. Goshen Health Sys.*,
No. 3:19-CV-586 DRL-MGG, 2022 U.S. Dist. LEXIS 42498, at *25 (N.D. Ind. Mar. 10, 2022)....................7, 8, 11

*Culliver v. Taylor*,
503 F.3d 397 (5th Cir. 2007)....................15

*Doe v. Rogers*,
139 F. Supp. 3d 120 (D.D.C. 2015)....................9

*Entergy Gulf States, Inc. v. Summers*,
282 S.W.3d 433 (Tex. 2009)....................19, 20

*Gonino v. Private Health Care Sys., Inc.*,
No. 3:04-CV-1940-G, 2004 U.S. Dist. LEXIS 33045 (N.D. Tex. Nov. 12, 2004)....................8, 14

*Griggs v. Hinds Junior College*,
563 F.2d 179 (5th Cir. 1977)....................22

*Gudes v. Wilson Health*,
No. 3:22-cv-341, 2023 U.S. Dist. LEXIS 136542 (S.D. Ohio Aug. 4, 2023)....................14

*Hester v. Bell-Textron, Inc.*,
11F.4th 301, 304-05 (5th Cir. 2021)....................15

*Kern v. GE*,
No. 3-02-CV-2435-L, 2003 U.S. Dist. LEXIS 10331 (N.D. Tex. June 17, 2003)....................18

*KPH Consolidation, Inc. v. Romero*,
102 S.W.3d 135 (Tex. App.—Houston [14th Dist.] 2003), aff'd,
166 S.W.3d 212 (Tex. 2005) ....................16

*Leal v. Sec'y, U.S. Dep't of Health & Human Servs.*,
620 F.3d 1280 (11th Cir. 2010) ....................9, 10

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ....................15

*Mabary v. Hometown Bank, N.A.*,
276 F.R.D. 196 (S.D. Tex. 2011)....................15

*McCarthy v. Madigan*,
503 U.S. 140 (1992)....................7

*NME Hosps. Inc. v. Rennels*,
994 S.W.2d 142 (Texas. 1992) ....................2, 17, 18, 19

*Poliner v. Tex. Health Systems*,
537 F.3d 368 (5th Cir. 2008) ....................15

*Robinson v. E. Carolina Univ.*,
329 F.Supp. 3d 156 (E.D.N.C. 2018) ....................*passim*

*Satgunam v. Mich. State Univ.*,
556 Fed. Appx. 456 (6th Cir. 2014)....................7, 8

*Sibley Mem'l Hosp. v. Wilson*,
488 F.2d 1338 (D.C. Cir. 1973)....................17, 18

*Walker v. Mem'l Health Sys.*,
231 F.Supp. 3d 210 (E.D. Tex. 2017)....................15

*Whole Woman's Health v. Jackson*,
642 S.W.3d 569 (Tex. 2022) ....................16

**Statutes**

42 U.S.C. § 1997e(a)....................7

Health Care Quality Improvement Act....................7

Tex. Health & Safety Code § 161.135....................*passim*

Tex. Health & Safety Code § 161.135(a) ........................................................19, 20

Tex. Lab. Code § 21.055..............................................................................1, 17, 19

Tex. Lab. Code § 161.135(c) .......................................................................20, 21

Tex. Occ. Code § 160.010(b)........................................................................15, 16

Tex. Occ. Code § 160.010(c) ...............................................................................16

**Rules**

Fed. R. Civ. P. 8(a)(2)........................................................................................14

Fed. R. Civ. P. 12(b)(1)..........................................................................................7

Fed. R. Civ. P. 12(b)(6)....................................................................................15, 17

Fed. R. Civ. P. 15(a).............................................................................................22

Fed. R. Civ. P. 15(a)(2).........................................................................................21

**Other Authorities**

Health & Human Services, Nat'l Practitioner Data Bank, NPDB Guidebook, Ch. F (2026), available at https://www.npdb.hrsa.gov/guidebook/FDisputeProcess.jsp (last visited Apr. 11, 2026) .........................................................................9

## I. Nature and Stage of Proceeding

This is a discrimination and defamation lawsuit arising from Dr. Ofosu's employment with Defendant Baylor College of Medicine ("BCM") and her service on the Hospital's medical staff. The retaliation claims revolve around efforts by the Hospital's chief of Interventional Radiology ("IR") and certain colleagues' efforts to drive Dr. Ofosu from the medical staff and her employment with BCM. The defamation claims are based on false accusations and reports that Dr. Ofosu repeatedly deviated from the standard of care.

Dr. Ofosu filed her original petition in state court on January 29, 2026. The 157th District Court of Harris County granted a temporary restraining order at that time, after which Defendants removed the case to the Southern District of Texas. Defendants filed Motions for a More Definite Statement on February 23, 2026. While Dr. Ofosu disagreed with the Motions' contentions, she amended her Complaint in the interest of efficiency. Her First Amended Complaint ("Complaint") alleges cognizable claims of defamation, tortious interference with existing contracts, malicious/sham peer review, retaliation under Section 21.055 of the Texas Labor Code and Section 161.135 of the Texas Health and Safety Code, and requests for injunctive and declaratory relief.

## II. Statement of the Issues

1. For a court to have subject matter jurisdiction, must a physician

disputing an NPDB report have exhausted all administrative remedies even when the NPDB dispute process cannot, by law, yield the relief sought?

2. May a Texas physician bring a lawsuit for malicious/sham peer review?

3. Was the Hospital in a position to interfere with Dr. Ofosu's employment with BCM such that it qualifies as an indirect employer under the standard set out by the Texas Supreme Court in *Rennels*?

4. Does Section 161.135 of the Texas Health & Safety Code, which prohibits a hospital from retaliating against a non-employee for reporting a violation of law, apply only when such reports are made directly to the hospital?

## III. Relevant Factual Background

Dr. Ofosu is a board-certified Interventional Radiologist and graduate of a top IR program. Doc. 17 at ¶ 19. She became a BCM associate professor in August 2024 under an agreement that made her employment contingent upon maintaining a position on the Hospital's medical staff. *Id.* at ¶ 20.

BCM owns 50% of the Hospital. *Id.* at ¶¶ 20, 22; *see also* Doc. 15 at § II. The two entities have overlapping leadership, and BCM physicians play a key role in the Hospital's operations. *Id.* at ¶ 22.

Soon after Dr. Ofosu joined the medical staff, she began experiencing troubling interactions with Defendant Wu, the Hospital's chief of IR. *Id.* at ¶ 23.

As it turned out, Dr. Wu had a reputation for having difficulty working with female professionals. *Id.* at ¶¶ 23, 27.

From the outset, Dr. Wu took an aggressive stance with Dr. Ofosu. *Id.* at ¶ 27. In one incident, he barged repeatedly into the Hospital's operating room while Dr. Ofosu was performing a procedure—on a patient who was awake—and began loudly accusing Dr. Ofosu of clotting the patient's artery. *Id.* at ¶ 29-33. Dr. Ofosu and a nurse who witnessed his behavior confirmed that the accusations were false. *Id.* at ¶ 30. Shortly after Dr. Ofosu asked that they speak privately, Dr. Wu exclaimed, "Oh, somebody is going to be losing her job!" *Id.* at 32.

That same day, January 22, 2025, Dr. Ofosu contacted the chair of radiology, who spoke with Dr. Wu and got an ombudsman involved. *Id.* at ¶ 34.

January 22 would be the last day that Dr. Wu, who handled IR scheduling at the Hospital, would allow Dr. Ofosu to work at the Texas Medical Center campus. Beginning January 23, Dr. Wu exiled her to more distant Hospital locations. *Id.* at ¶ 35-36.

When their interactions did not improve, Dr. Ofosu filed a formal complaint of gender discrimination with BCM Human Resources. *Id.* at ¶ 39. By this time the harassment had become widely known at BCM and the Hospital. *Id.* The Hospital's president, who serves on the BCM faculty, never intervened. *Id.* at ¶ 127.

Within five days of Dr. Ofosu's HR complaint, Defendant Fahrtash, a Wu ally, threatened her with a punitive peer review if she did not leave the medical staff and BCM. *Id.* at ¶ 40. He told her the Hospital's medical staff would "humble" her by imposing humiliating restrictions on her professional autonomy. *Id.*

Dr. Ofosu's six-month review in March proved to be anything but routine. *Id.* at ¶¶ 41-45. Three physicians served on her panel: Dr. Wu and Defendants Horn and Nuffer. *Id.* at ¶ 41. Unlike the other new hires, Dr. Ofosu was required to appear before the panel in person rather than via Zoom. *Id.* The panel also admitted to scrutinizing her performance more closely than that of male new hires. *Id.* at ¶ 44. They acknowledged that no high-risk clinical incidents had been reported for any of her procedures but nevertheless claimed to have identified serious errors in six of her cases. *Id.* at ¶ 42.

The Hospital's senior IR physician, however, found no evidence of violations of the standard of care when he reviewed the cases. *Id.* at ¶ 43. And when Dr. Ofosu's performance was assessed by providers other than Dr. Wu and his allies, she received favorable ratings. *Id.* at ¶¶ 25, 38, 51.

The day after Dr. Ofosu's six-month review, Dr. Wu stripped her of her clinical IR duties altogether. *Id.* at ¶ 46. This suspension of privileges did not comport with the Hospital's medical staff bylaws. *Id.* at ¶ 47.

Drs. Wu, Horn, and Nuffer then referred four of the cases discussed during Dr. Ofosu's six-month review to peer review—just as Defendant Fahrtash had threatened. *Id.* at ¶ 47. No other IR physician had ever been peer reviewed—even after a patient's death. *Id.* at ¶ 58.

When the medical staff's designated IR peer review committee representative said he would present the cases to the committee after returning from a short vacation, Dr. Wu rushed to install another ally, Defendant Savjani, in the representative's place—another breach of protocol. *Id.* at ¶ 48-49. The result of this irregular process was predictable: Drs. Savjani and Horn joined Dr. Wu in recommending that Dr. Ofosu's privileges be curtailed based on alleged quality-of-care issues. *Id.*at ¶¶ 53-59, 67. The restrictions were unprecedented: 50 proctored procedures within a six-month period. *Id.* at ¶ 53. Regardless of how expeditiously she could schedule other physicians to proctor 50 procedures, the six-month period ensured she would be reported to the NPDB—and her career forever tarnished. *Id.* at ¶¶ 40, 53, 67-68.

The cases in which the peer review alleged deviations from the standard of care involved no observations of patient harm. *Id.* at ¶¶ 95-96. The "deviation" in one case was the disproved arterial clot. *Id.* at ¶¶ 31, 53. In another, the peer review alleged that Dr. Ofosu had punctured a patient's colon. *Id.* at ¶ 56. Neither of the

patients in these cases received treatment for such serious conditions, which, if true, would have called for immediate intervention. *Id.* at ¶¶ 55-56.

In addition to the senior IR physician who had reviewed the cases, three board-certified IR physicians retained by Dr. Ofosu found no standard-of-care issues in the four cases. *Id.* at ¶¶ 54-57. As one expert opined, "something else" must have been going on. *Id.* at ¶¶ 56-57.

On September 15, 2025, Dr. Ofosu received a letter from the Hospital's president rubber-stamping the peer review committee's rushed recommendation. *Id.* at ¶¶ 53, 132. Acknowledging she could not perform her specialty in a hostile environment hobbled by the proctoring penalty, Dr. Ofosu left BCM; the Hospital did not permit her to keep her privileges. *Id.* at ¶ 95. She tried to pursue her due process rights under the medical staff bylaws but withdrew from the fair hearing process when the Hospital's appointed officer refused to order the Hospital to provide her experts with access to 3D images necessary to prepare a response to the alleged violations of the standard of care. *Id.* at ¶¶ 64-65.

The interference in Dr. Ofosu's procedures, the disparate treatment she encountered, the threats of a punitive peer review, the published accusations of incompetence, the jettisoning of medical staff procedures, and the imposition of an unprecedented number of proctoring requirements demonstrate Defendants' malice. *See id.* at ¶¶ 70-75.

Dr. Ofosu filed this case seeking a fair and impartial assessment of the Defendants' conduct and the veracity of their allegations regarding her performance.

## IV. Argument

### A. The Hospital's 12(b)(1) Motion to Dismiss should be denied.

This Court has subject matter jurisdiction over Counts 1 and 6 of the Complaint and Plaintiff's application for injunctive relief; the Hospital's Rule 12(b)(1) "factual attack" of federal jurisdiction based on lack of exhaustion of administrative remedies should therefore be denied.

#### 1. A court has subject matter jurisdiction over a physician's causes of action that involve an NPDB report when exhausting all administrative remedies would be futile.

Physicians are not required to exhaust all administrative remedies under the NPDB dispute process before filing suit if their interests "weigh heavily" against such a requirement. *See Robinson v. E. Carolina Univ.*, 329 F.Supp. 3d 156, 171-74 (E.D.N.C. 2018) (citing *McCarthy v. Madigan*, 503 U.S. 140, 144-45 (1992) (superseded by statute on other grounds, 42 U.S.C. § 1997e(a)).[1] Exhaustion of remedies is not a mandatory Health Care Quality Improvement Act ("HCQIA") requirement. *Bonzani v. Goshen Health Sys.*, No. 3:19-CV-586 DRL-MGG, 2022

[1] The courts have not, as the Motion asserts, "imputed" a requirement that all administrative remedies be exhausted. Rather, "sound judicial discretion governs," and courts must weigh the plaintiff's need for a swift judicial review with the government's interest in efficiency. *Satgunam v. Mich. State Univ.*, 556 Fed. Appx. 456, 464 (6th Cir. 2014).

U.S. Dist. LEXIS 42498, at *25 (N.D. Ind. Mar. 10, 2022) (A physician "may—not must—dispute [an NPDB] report.").

When, as here, an agency lacks the power to grant the plaintiff effective relief, dismissal for lack of exhaustion is excused and the case should not be dismissed for lack of subject matter jurisdiction. *See Robinson*, 329 F.Supp. 3d at 173-74 (a physician was not required to exhaust all administrative remedies in disputing the NPDB report because the Secretary of the Department of Health and Human Services ("Secretary") was unable to grant the declaratory and injunctive relief she sought); *Bonzani*, 2022 U.S. Dist. LEXIS 42498, at *26-27 (because the Secretary lacked authority to investigate the basis for the NPDB report against the physician, the agency lacked the power to grant him relief, leading the court to decline to dismiss his lawsuit for lack of exhaustion); *see also Gonino v. Private Health Care Sys., Inc.*, No. 3:04-CV-1940-G, 2004 U.S. Dist. LEXIS 33045, at *5-6 (N.D. Tex. Nov. 12, 2004) (holding that the court lacked subject matter jurisdiction over the physician's claim only because the injunctive relief sought was the "same relief" he could have obtained from the Secretary).

The Secretary has limited powers to review a contested NPDB report. *Satgunam*, 556 Fed. Appx. at 464-65; *Robinson*, 329 F.Supp. 3d at 172. The Secretary may only make a superficial review of the documentation to determine whether the report, as submitted, accurately describes the adverse action taken and

the hospital's explanation of "what the physician did wrong" and whether, as described, the hospital's action was reportable under the rules. *See Robinson*, 329 F.Supp. 3d at 172 (citing *Leal v. Sec'y, U.S. Dep't of Health & Human Servs.*, 620 F.3d 1280, 1284 (11th Cir. 2010) (citations omitted) and U.S. Dep't of Health & Human Servs., Health Resources & Servs. Admin., NPDB Guidebook F-5, F-6, F-7, F-16 (2015)).

The Secretary may not, however, dig deeper to determine if the report describes the events as they actually occurred. *See Leal*, 620 F.3d at 1284. "[T]he Secretary's review of information in the Data Bank is limited in scope. The review process does not provide a physician with a procedure for challenging the reporting hospital's adverse action." *Id.*; *see also* U.S. Dep't of Health & Human Services, Nat'l Practitioner Data Bank, NPDB Guidebook, Ch. F (2026), available at https://www.npdb.hrsa.gov/guidebook/FDisputeProcess.jsp (last visited Apr. 11, 2026).[2]

Among other things, the Secretary:

- cannot "adjudicate the underlying merits of the events, professional review actions, activities, findings, or determinations." *Doe v. Rogers*, 139 F. Supp. 3d 120, 147-48 (D.D.C. 2015) (the Secretary's review

[2] A PDF of the NPDB's Dispute Process rules and limitations is attached as Exhibit A for the Court's convenience.

of an NPDB report was not broad enough to determine whether the physician had voluntarily resigned from a hospital or whether his departure had been "fraudulently obtained");

- cannot "act as a factfinder deciding whether incidents listed in the report actually occurred." *Robinson,* 329 F.Supp. 3d at 172 (quoting *Leal*, 620 F.3d at 1284);
- cannot act "as an appellate body deciding whether there was sufficient evidence for the reporting hospital to conclude that those actions did occur." *Id.;*
- cannot review "[t]he underlying reasons for the report, such as the merits of a medical malpractice claim or . . . [t]he extent to which entities followed due process procedures." Ex. A, NPDB Guidebook, Ch. F;
- cannot independently investigate medical or clinical issues, assess the propriety of treatment, or try to verify information in the report. *See id.;* and
- cannot review diagnostic images or other expert opinions regarding the adverse action. *Id.*

When a physician seeks relief that the Secretary cannot provide, the physician should not be required to exhaust her administrative remedies in

disputing an NPDB report because doing so would be futile. *See Robinson,* 329 F.Supp. 3d at 172-74; *Bonzani,* 2022 U.S. Dist. LEXIS 42498, at *26-27. Thus, because the Secretary lacked authority to provide a physician's requested injunction and declaration that a hospital's investigation had been "biased and incomplete" and "false and improvidently issued," the court in *Robinson* allowed the claims. *Robinson,* 329 F.Supp. 3d at 172-174. Exhaustion would have been futile because the Secretary had no power to assess the investigation, could determine only whether an adverse action was reportable but not whether the plaintiff physician was responsible for the patient's injury, could not void the report based on the reasons the plaintiff put forth, and could not force the defendants to void the report. *Id.* at 174.

As *Robinson* and other cases indicate, before requiring a physician to exhaust the NPDB dispute process, courts should ascertain whether the Secretary has the authority to grant the relief sought; if the effort would be futile, the physician should be permitted to seek relief in court, and the case should not be dismissed for lack of subject matter jurisdiction.

### 2. The relief Dr. Ofosu seeks from this Court is not within the Secretary's purview, so she should not be required to exhaust all administrative remedies under the NPDB dispute process.

Because the Secretary cannot grant Dr. Ofosu the injunctive and declaratory relief she seeks from this Court, the challenged causes of action should not be dismissed. Relevant to the relief Dr. Ofosu seeks, the Secretary:

- cannot investigate the validity of Defendants' accusations that Dr. Ofosu violated the standard of care or consider the opinions of the four other IR professionals that Dr. Ofosu did, in fact, meet the standard of care. *See* Ex. A, NPDB Guidebook, Ch. F; *see also* Doc. 17 at ¶ 138 (Dr. Ofosu's request for declaratory relief), ¶ 140 (Dr. Ofosu's application for injunctive relief);
- cannot consider the radiological images necessary to disprove the Hospital's accusations. *See id.; see also* Doc. 17 at ¶¶ 63-64;
- cannot assess the propriety of imposition of 50 proctoring requirements over a six-month period—especially given that the medical staff had never peer reviewed any male IR physician, much less imposed such a harsh penalty. *See* Ex. A, NPDB Guidebook, Ch. F*; see also* Doc. 17 at ¶¶ 53, 70-75, 89, 94, 138;
- cannot consider whether an IR physician whose profession requires examination of three-dimensional images can be provided a fair

hearing when she is denied access to the images in a form necessary to defend herself against the false accusations. *See* Ex. A, NPDB Guidebook, Ch. F;

- cannot void the NPDB report based on a determination that it was a product of malice rather than violations of the standard of care. *See id*.; *Robinson*, 329 F.Supp. 3d at 174*; see also* Doc. 17 at ¶¶ 70-75, 138, 140, and
- cannot instruct the Hospital to withdraw the report. *See Robinson*, 329 F.Supp. 3d at 174.

Because the relief Dr. Ofosu seeks in Counts 1 and 6 and in her application for an injunction are not within the Secretary's purview, Dr. Ofosu's participation in the NPDB dispute process cannot result in what only this Court can provide: fact-finding and examination of the issues that led to the report and an order requiring the Hospital to retract its NPDB report. Because in this case Dr. Ofosu will be unable to obtain the relief she seeks from the Secretary, the Court should permit her defamation claim and requests for declaratory and injunctive relief to proceed and deny the Hospital's 12(b)(1) motion to dismiss.

### 3. Because the Secretary has no authority to order damages, it would be doubly improper to dismiss Dr. Ofosu's defamation claim for lack of subject matter jurisdiction.

Requiring a physician to exhaust all administrative remedies in connection with a disputed NPDB report is justified only when the plaintiff seeks in court the same relief sought from the Secretary. *See Robinson*, 329 F.Supp. 3d at 172-174; *Gudes v. Wilson Health*, No. 3:22-cv-341, 2023 U.S. Dist. LEXIS 136542, at *14-17 (S.D. Ohio Aug. 4, 2023) (dismissing claim for injunctive relief but permitting claims for damages—including a defamation claim—to proceed to discovery); *Gonino*, 2004 U.S. Dist. LEXIS 33045, at *5-6 (sending defamation claim to arbitration). But the Secretary has no authority to order a hospital to pay damages. *See Gudes*, 2023 U.S. Dist. LEXIS 136542, at *14-17; *Gonino*, 2004 U.S. Dist. LEXIS 33045, at *5-6. There is no basis, then, for dismissing Dr. Ofosu's defamation claim against the Hospital for lack of subject matter jurisdiction.

Because the Secretary is not authorized to provide Dr. Ofosu the relief she requests in Counts 1 and 6 and her application for injunctive relief, the Court should deny the Hospital's 12(b)(1) Motion to Dismiss in its entirety.

## B. The Hospital's 12(b)(6) Motion to Dismiss should be denied.

Rule 8(a)(2) requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). For a complaint to survive dismissal, it must allege sufficient facts which, accepted as true, state a claim that

is plausible on its face. *Hester v. Bell-Textron, Inc.*, 11F.4th 301, 304-05 (5th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (reversing dismissal of an employee's retaliation claim). A facially plausible claim alleges facts from which the court may reasonably infer the defendant's liability for the alleged misconduct. *Id.* Plausibility does not equate to probability, but, when the complaint is viewed in the light most favorable to the plaintiff, requires something more than a "sheer possibility." *Mabary v. Hometown Bank, N.A.*, 276 F.R.D. 196, 208 (S.D. Tex. 2011) (citing *Culliver v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rule 12(b)(6) motions to dismissed are disfavored. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 231 (5th Cir. 2009) (internal citation omitted).

**1. Malicious/sham peer review is indeed a cause of action under Texas law.**

No Texas court has held that a cause of action for malicious/sham peer review does not exist, nor does the Hospital cite to any case that stands for that proposition. Instead, several courts have held that allegations of malicious peer review may support injunctive and declaratory relief. *See Poliner v. Tex. Health Systems*, 537 F.3d 368, 381 (5th Cir. 2008); *Walker v. Mem'l Health Sys.*, 231 F.Supp. 3d 210, 214-15 (E.D. Tex. 2017) (quoting *id.*).

Furthermore, Texas does permit a cause of action for malicious peer review. Section 160.010(b) states that "[a] cause of action does not accrue against a

member, agent, or employee of a medical peer review committee or against a health care entity from any act, statement, determination or recommendation made, or act reported, *without malice*, in the course of medical peer review." Tex. Occ. Code § 160.010(b) (emphasis added); *see also id.* § 160.010(c) (peer-review immunity applies only in the absence of malice). It follows that a cause of action *does* accrue when, as here, a peer review involves malice.

The Hospital's interpretation would render the language in Sections 160.010(b) and (c) meaningless. If one could never be sued for any activities performed during medical peer reviews, regardless of malicious intent, there would be no point to the statute—an interpretation not permitted under Texas law. *See Whole Woman's Health v. Jackson*, 642 S.W.3d 569, 581 (Tex. 2022) (stating courts are not permitted to interpret statutes in a manner that renders parts of them meaningless). As in a malicious credentialing cause of action—recognized in Texas—the "heart" of a malicious peer review claim is malice. *See KPH Consolidation, Inc. v. Romero*, 102 S.W.3d 135, 143 (Tex. App.—Houston [14th Dist.] 2003), aff'd, 166 S.W.3d 212 (Tex. 2005) ("Malicious credentialing is a cause of action against a hospital for acting with malice in credentialing a doctor or in peer review."). Malicious credentialing and malicious peer review involve failures by a hospital in screening or policing its medical staff, with the harm falling on different victims.

Because Dr. Ofosu has stated a claim for malicious peer review, the claim should not be dismissed under Rule 12(b)(6).

**2. Dr. Ofosu has adequately alleged standing under Section 21.055 of the Texas Labor Code.**

The Complaint sufficiently alleges an indirect employment relationship with the Hospital permitting Dr. Ofosu to pursue her claim against it under Section 21.055 of the Texas Labor Code.

Under *Rennels*, a defendant may be found to be an indirect employer of the plaintiff under Section 21.055 if (a) the defendant meets the statutory definition of "employer," (b) the plaintiff was an employee of a third party, and (c) the defendant was in a position to control the plaintiff's access to employment opportunities with a third party and interfered with that access. *NME Hosps. Inc. v. Rennels*, 994 S.W.2d 142, 147 (Texas. 1992) (citing *Sibley Mem'l Hosp. v. Wilson*, 488 F.2d 1338, 1341-43 (D.C. Cir. 1973) (holding that the Defendant hospital qualified as an indirect employer because it "was in a position to interfere with [the plaintiff's] employment relationship.")). The Motion attacks the third element but does not show that Dr. Ofosu lacks standing to assert a claim under Section 21.055.

Determining whether a defendant qualifies as an indirect employer under the statute is a fact-intensive inquiry; because Dr. Ofosu has alleged sufficient facts supporting such a relationship, the determination of whether the Hospital can be found to be her indirect employer should not be made in response to a motion to

dismiss. *See, e.g., Kern v. GE*, No. 3-02-CV-2435-L, 2003 U.S. Dist. LEXIS 10331, at *15 (N.D. Tex. June 17, 2003) (noting alleged relationships among the defendant "employer" and a "family of companies," including the employer of the plaintiff claiming retaliation, and finding dismissal at the pleading stage improper in light of the fact-intensive nature of the inquiry).

The Complaint alleges that the Hospital has the ultimate authority to influence the employment of any physician whose employment with BCM is contingent upon membership on the Hospital's medical staff: drive the physician off the medical staff. Doc. 17 at ¶ 20. How much more control or ability to influence a BCM physician's employment could the Hospital have? *See Rennels*, 994 S.W.2d at 145 (quoting *Sibley Mem'l Hosp.*, 488 F.2d at 1341) ("'To permit a covered employer to exploit circumstances peculiarly affording it the capability of discriminatorily interfering with an individual's employment opportunities with another employer, while it could not do so with respect to employment in its own service, would be to condone continued use of the very criteria for employment that Congress has prohibited.'").

Furthermore, the Hospital's and BCM's operations are intertwined. Doc. 17 at ¶¶ 20-22; Doc. 15 at § II. The Hospital is BCM's teaching hospital; BCM professors comprise the Hospital's medical staff. Doc. 17 at ¶¶ 20, 22. Even the Hospital's president is a BCM faculty member. *Id.* at ¶ 22. BCM owns half the

Hospital, and the two entities' officers overlap. *Id.* Dr. Wu, a BCM assistant professor but also the Hospital's chief of IR, was hardly scheduling Dr. Ofosu and taking other actions against her in a Baylor silo. *See id.* at ¶¶ 23, 35, 46-47. Like other parties in this lawsuit, he was wearing two hats. Nothing in *Rennels* and its progeny requires the Court to ignore the obvious connections between the Hospital and Baylor in determining whether the Complaint adequately alleges that the Hospital was in a position to interfere with Dr. Ofosu's employment. *See Rennels*, 994 S.W.2d at 147.

Because the Complaint pleads facts sufficient to allege an indirect employment relationship under Section 21.055, Dr. Ofosu has standing to bring this claim against the Hospital under the Texas Labor Code.

**3. Dr. Ofosu has stated a claim under Section 161.135 of the Texas Health & Safety Code.**

Section 161.135 of the Texas Health and Safety Code prohibits a hospital from retaliating against non-employees for reporting violations of law to anyone; neither the statute nor case law requires that the report be made to the hospital itself. *See* Tex. Health & Safety Code § 161.135(a). When interpreting a Texas statute, a court must discern the legislative intent based on the text's plain meaning. *Entergy Gulf States, Inc. v. Summers*, 282 S.W.3d 433, 437 (Tex. 2009). The relevant language states that "[a] hospital, mental health facility, or treatment facility may not retaliate against a person who is not an employee for reporting a

violation of law." *See* Tex. Health & Safety Code § 161.135(a). On its face, Section 161.135(a) does not restrict its applicability to reports to the hospital. *See id*.[3]

Furthermore, the interpretation of Section 161.135(a) advanced by the Hospital would lead to absurd results, in violation of basic principles of statutory interpretation. *See Entergy Gulf States*, 282 S.W.3d at 147 (the general rule is that a statute's meaning is based on the words' plain meaning unless "enforcing the plain language of the statute as written would produce absurd results"). If a hospital is liable for retaliation only when the reports are made to it alone, then it would face no liability for retaliating against a non-employee who reported the hospital's violations of law to, say, the Texas Department of State Health Services. Surely that is not the result intended by the Legislature.

Timing is not an element of a cause of action brought under Section 161.135, so the Motion's challenging of the timing of the retaliatory conduct is of no relevance in assessing whether Dr. Ofosu states a claim here. *See* Tex. Lab. Code § 161.135. The timing of the retaliatory action following a report solely determines whether the plaintiff is entitled to a rebuttable presumption of retaliation. *See id.* at § 161.135(c). If the Hospital retaliated 100 days after Dr.

---

[3] That plaintiffs in three other cases filed claims under the statute for retaliation based on reports to the hospital does not inform the meaning of the statute. *See* Doc. 23 at 11.

Ofosu's report, Dr. Ofosu would still be able to pursue the claim; she simply would not be entitled to the presumption. *See id.* The timing therefore provides no basis for dismissal of this cause of action.

Because Section 161.135 does not limit its applicability to reports made directly to the Hospital and the timing of the Hospital's retaliatory conduct does not determine whether Dr. Ofosu has stated a claim under the statute, the Hospital's Motion to Dismiss on this cause of action should be denied.

## V. Conclusion

The Hospital's 12(b)(1) Motion to Dismiss should be denied because this Court has subject matter jurisdiction over Dr. Ofosu's defamation claim, her declaratory judgment action, and her request for injunctive relief. The Hospital's 12(b)(6) Motion to Dismiss also should be denied because Dr. Ofosu has sufficiently pled her claims for retaliation under the Texas Health and Safety Code and Texas Labor Code and a cause of action for malicious peer review exists under Texas law.

## VI. In the alternative, motion for leave to file an amended complaint.

In the alternative, Plaintiff Charlene Ofosu, M.D., seeks leave of the Court to file an amended complaint to cure any pleading deficiencies identified by the Court. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given when

justice so requires); *Griggs v. Hinds Junior College*, 563 F.2d 179, 180 (5th Cir. 1977) (citing Rule 15(a) and reversing trial court's denial of leave to amend).

## VII. Prayer

Plaintiff prays that Defendant CHI St. Luke's Motion to Dismiss Plaintiff's Amended Complaint be denied in its entirety. In the alternative, in the event the Court identifies pleading deficiencies, Plaintiff respectfully requests that she be permitted to file an amended Complaint.

Dated: April 17, 2026

Respectfully submitted,

**NICHOLS WEITZNER THOMAS LLP**

*/s/ Scott Nichols*
Scott Nichols
Texas Bar No. 14994100
snichols@nwtlaw.com
(713) 405-7094
Zachary W. Thomas
Texas Bar No. 2470739
zthomas@nwtlaw.com
(713) 405-7096
2402 Dunlavy Street
Houston, Texas 77006

## CERTIFICATE OF WORD COUNT

I certify that the foregoing Plaintiff's Opposition to Defendants Baylor College of Medicine and Drs. Kaiming Wu, Gary Horn, Zachary Nuffer, Neal Savjani, and Sina Fahrtash's Partial Motion to Dismiss complies with the word-count limitation set by the Court's Procedures and that, according to the word-count feature of the word-processing system used to prepare the foregoing brief, the brief contains 4865 words, excluding the case caption, table of contents, table of authorities, signature block, and certificates.

*/s/ Scott Nichols*
Scott Nichols

Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on April 17, 2026, I served a copy of the foregoing Plaintiff's Opposition to Defendant CHI St. Luke's Health Baylor College of Medicine Medical Center's Motion to Dismiss on all counsel for Defendants by filing it in the Court's Electronic Case Filing system.

*/s/ Scott Nichols*
Scott Nichols

Attorney for Plaintiff